Sherwood **LESTER**, Libelant,

v.

**UNITED STATES** of America, **Respondent,**

and

**Marine Basin Company, Respondent-Impleaded.**

**No. 19389.**

United States District Court, E. D. New York.

Jan. 19, 1955.

Louis Bloch, New York City, Gay & Behrens, Edward J. Behrens, and Mack Kreindler, New York City, of counsel, for libelant.

Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., Howard F. Fanning, New York City, of counsel, for respondent.

William S. O'Connor, New York City, Gerard McGowan, New York City, of counsel, for respondent-impleaded.

BYERS, District Judge.

This cause involves injuries suffered by the libelant Lester on July 15, 1947 when he fell overside to starboard from the U. S. Motor Cruiser Q–100, to the floor of a dry dock of the impleaded respondent. The vessel was in that dock for the purposes of general overhaul, and there is no substantial factual dispute emerging from the testimony at the trial.

The libel alleged that Lester slipped and was thus caused to fall, because of the presence of oil or grease on the top of the trunk top or that part of the top deck of the vessel which is aft of the pilot house, and extends to the roof or covering of the cockpit at the stern.

It should be said at once that the libelant's evidence is devoid of demonstration of any oil, grease or other foreign substance which caused him to fall. If that were the entire case, dismissal would be inevitable without more. The foregoing constitutes a finding on that subject.

The libel also alleges fault on the part of the United States " * * * in causing, suffering and permitting said vessel and the deck and all the various parts thereof to be, become and remain out of repair and in a defective and dangerous condition, unsafe and unseaworthy." The foregoing was deemed at the trial to sufficiently allege unseaworthiness, and the briefs for respondents do not challenge that understanding.

The only important subject for discussion is whether the unseaworthy condition existed by reason of the absence of a rail extending above the bulwarks on the main deck, alongside of and a few inches higher than the trunk top, which if in place the libelant could have grasped and thus saved himself from the fall and its consequences.

For reasons which I shall try to make clear, it seems that the libelant has sustained his burden of proof.

In the first place, one of the provisions of the contract for this overhaul job is contained in specification 1.15 which reads as follows:

"Install Guard Rail

"Furnish labor and material to install brass guard rail, approximately 24″ high of 1¼″ dia. brass pipe complete with all stanchions and fittings (brass) on main deck bulwark cap rail port and starboard from after cockpit to forecastle cap rail flare, approximately sixteen (16) feet long. Provide suitable gangway opening in guard rail port and starboard."

Had that specification been adhered to prior to July 15, it is reasonable to suppose that the libelant would not

have fallen overside. The very presence in the contract of the quoted specification constitutes such a recognition by the Government of the necessity for this element of protection to those on board the vessel, that there is little room for argument that a business guest properly present on the vessel was not one of those whose safety was within the contemplation of the contracting parties.

The marine surveyor and inspector having supervision of the performance of the contract, Krull by name, became convinced while the work was going forward that the quoted specification should be changed so as to provide for the installation elsewhere of certain hand rails. As to the latter there is no occasion for discussion, since it clearly appears from Captain Maddalone's testimony (p. 194) that the grab rails which were indeed installed did not and could not serve the purpose of the railing as above specified.

He was the master of the Q–100 and was unable to explain why the specified brass railing was not supplied.

The explanation for the change is found in other testimony, namely that Krull believes that a notation made by one Neff, an employee of respondent-impleaded, explains why Krull acceded to the non-performance of this specification; that notation reads:

"Insufficient support on bulwark cap rail for this job. Substitute wooden grab rails against side of house as authorized by Army Surveyor Christof Krull. No change in quotation or new order."

It will be seen that the necessity for the rails was not repudiated, but the recommended method of their installation was deemed not to be feasible; also that the substitution, so-called, was not a substitution at all, but a kind of alternative make-shift which would not serve the same purpose as the bulwark rail.

That the work could have been done, but differently, appears from this observation by Krull (p. 230):

"Q. In your judgment where would have been the best place to install a pipe-rail described in that specification? A. It should have been set inboard resting and secured against the inboard side of the bulwark."

Thus the rail *could have* been supplied. True it would have rendered the passage on the main deck alongside of the cabin narrower even than would have resulted from following the specification as drawn; that probably would have forbidden walking in that space facing the bow or stern, "You must walk sideways" (p. 228), a not unheard of method in moving about on such craft as the Q–100.

The specification is assumed by Krull to have been drawn by the Chief Engineer of the Q–100 or the Captain—it was not couched in the language his own office would have used—which is consistent with a practical understanding of the necessity for the rail on the part of those who were most familiar with the vessel and her operation.

Lest it be thought that the point has been somewhat labored, it should be said that the evidence is quite convincing to the court that the absence of the rail was no casual defect in the Q–100. On the contrary the Government contracted to provide it, and for failure to adhere to that purpose, which was not an inadvertent oversight, it must respond to this libelant unless it appears from the testimony that the deficient condition was unrelated to Lester's fall.

The Government argues that libelant's testimony cannot be relied upon, because he persisted in saying that immediately prior to his fall he emerged from the pilot house in which he had been working, through a doorway leading *forward;* and that he was moving toward the bow as he fell.

There was no such doorway, and thus he was plainly and honestly mistaken. That cannot be held against him however; he was a landsman, doing electrical work and was probably unaware as he stepped out of the pilot house and moved in the direction he was facing on the trunk top to inspect the lights, the wiring.

of which he had been repairing, that he was actually walking toward the stern of the vessel instead of the bow.

He testified at the trial that he had taken a few steps when his feet slipped from under him, and he went over the side; that instinctively he grabbed for something to save himself, but nothing was there and he fell to the bottom of the dry dock, about 15 feet below, and suffered fractures of both legs.

It is true that the libel refers to an accumulation of oil or other slippery substance on the trunk top which caused him to fall. As has been said, there is no proof to sustain that allegation, but the libelant's testimony as to the fall itself is corroborated by those who found him in the position to which he had fallen, and he was then a little aft of midships of the Q–100.

There is no such variance between allegation and proof as to discredit Lester's narrative. Whether carpenters who were working nearby had dropped a screw or other object on the trunk top that caused Lester to lose his balance and fall is purely a matter of unnecessary and futile conjecture. The fact is that he did fall overside to starboard and there was no rail in the path of his fall which could well have saved him from dropping as far as he did. The absence of that rail is not excused by Lester's failure to make an accurate mental note of all circumstances attending the accident itself.

That such a rail would have afforded an obstacle to the fall will be apparent from an examination of the photographs of the vessel received in evidence. The Q–100 was about 60 feet overall, her beam was 14.6 and her draft afloat about 4 feet. Her superstructure consisted of a cabin which extended forward from the cockpit at the stern to within about fifteen feet of the stem. The bow deck is not important as to dimensions.

Above the cabin and at about midships was the pilot house, entry into which was had from aft by port and starboard doors which opened aft. The roof of the cabin, called the trunk top, was a deck of wood covered with canvas, and it extended aft to the roof of the cockpit. This constituted the only access to the pilot house from the main deck which ran alongside the cabin and extended as best shown in Exhibit 7 forward so as to also afford access to the foredeck; the detail of that construction need not be described.

This trunk top was a flush deck about 10 feet fore and aft, and about 10 feet wide at the forward end (pilot house), tapering to about 9 feet at the cockpit end, having a camber of about three-quarters of an inch. It was unencumbered at the time of the accident, but when the vessel was in commission it carried certain gear, i. e., davits to port and a dinghy; also a utility box housing propane gas bottles (Exhibit 2).

The width of the main deck alongside the cabin was about 18 inches. Thus in falling Lester covered that distance beyond the trunk roof in going overside. The evidence shows that he fell from a position on the trunk top sufficiently aft of the pilot house so that the rail as contracted for in the quoted specification would have been available to him in the effort to save himself from going overside. This is a finding to the effect stated.

The cases relied upon to defeat libelant's cause have been examined:

Hanrahan v. Pacific Transport Co., 2 Cir., 262 F. 951; Newport News Shipbuilding & Dry Dock Co. v. Watson, 4 Cir., 19 F.2d 832; The Santa Clara, D. C., 206 F. 179; Brick v. Long Island R. Co., 245 N.Y. 222, 157 N.E. 93.

They all involve absence of a rail on a vessel under circumstances remote in fact from the evidence in this case. None of course contains any such element as the contractual recognition by the vessel owner of the necessity for installing a rail, the absence of which was causally related to a personal injury.

The word "necessity" is used because otherwise the quoted specification would not appear in the contract for overhaul. That is much more persuasive than the

language quoted for instance from the opinion in the Brick case.

Also it is thought to meet the test stated in Berti v. Compagnie, etc., 2 Cir., 213 F.2d 397 because if the Q–100 had been deemed reasonably fit, etc., the Government would not have been at pains to contract to remedy an obvious deficiency.

The libelant is therefore held to be entitled to a decree against the respondent.

It will be convenient now to discuss the claim for indemnity against the Marine Basin Co. impleaded. That was the company making the overhaul and the vessel was in its dry dock for the purpose.

Since it is found that Lester's fall is not shown to have been the result of his slipping upon a foreign substance present on the trunk top, only the following provisions of the contract need be quoted:

"Article 5(e) The Contractor shall place proper safeguards for the prevention of accidents, and shall put up and keep at night suitable and sufficient lights where necessary during the prosecution of the work and use its best efforts to prevent accidents or injury to persons or property."

" *    *    *    *    *    *

"(q) The Contractor shall exercise reasonable care and take all necessary or special precautions required to insure the safety of all employees, persons and property in and about the work, and to insure the safety of the vessel or portions thereof upon which work is done."

" *    *    *    *    *    *

"Supplemental Agreement 'A'

"Article 9(a) The Contractor shall exercise reasonable care and use its best efforts to prevent accidents, injury or damage to all employees, persons and property in and about the work, and to the vessel or portion thereof upon which work is done.

"(b) The Contractor does indemnify and hold harmless the Government, * * * against all suits, actions, claims, costs or demands (including, without limitation, suits, actions, claims, costs or demands for death, personal injury, and property damage) to which the Government, its agencies and instrumentalities, * * * may be subject or put by reason of damage or injury (including death) to the * * * person of any one other than the Government, * * * arising or resulting from the fault, negligence, wrongful act or omission of the Contractor * * *."

It is argued for the United States that it required no indemnity for fault solely on the part of Marine. Porello v. United States, 2 Cir., 153 F.2d 605; also Id., D.C., 94 F.Supp. 952. This means that if the fault was shared by both the vessel owner and the contractor, the indemnity clause must operate in favor of the Government.

Assuming arguendo the law to have been settled to that effect, the primary inquiry would be whether Marine was at fault at all. If it were not for the circumstances above referred to concerning the virtual cancellation of subd. 1:15, I should suppose that the answer would necessarily be in the negative, since no defective appliance under the operation and control of Marine in any wise caused the injury to libelant as in the Porello case.

The issue thus is narrowed to the question of the possible participation by Marine in the decision not to install the rail contracted to be erected *on* the bulwark. It is a fair inference that Neff pointed out the insufficiency of the bulwark cap rail, both vertically and horizontally, to support the projected brass rail described in the specification; however, the decision to abandon the latter is not shown to have been his, nor could it have

been in view of Krull's authority. Moreover, it was the latter who must have decided not to order a correct and substantial supporting construction, one "set inboard resting and secured against the inboard side of the bulwark."

■ It was the exercise of Krull's judgment not that of Neff, that resulted in the failure to provide the rail; it must be apparent that Neff could not overrule Krull's exercise of judgment. Thus it is concluded that no finding of negligence on the part of Marine can be based upon the alteration in the specification, and it is so found.

The impleading petition, in addition to alleging custody and control of the Q–100, asserts that at the time of delivery the vessel and "her equipment were in safe and proper condition for the use by Marine * * * its agents, servants and employees."

It has been the effort to show that the contrary was the fact, in the judgment of this court.

The petition continues by alleging that it was the duty of Marine to act with reasonable care "to avoid creating dangerous conditions * * * to eliminate such as might arise * * * and to conduct its operations in a manner which would eliminate the possibility of liability being visited upon * * * (the U. S.) for personal injuries to an employee of Marine."

One of the objects of the overhaul was to eliminate the unsafe condition which has been described. The argument is made in this connection that DeMar's testimony (p. 217) indicates the presence of brackets on the starboard side of the trunk top to receive stanchions on which life lines could be rigged, and it is urged that Marine should have done that.

His testimony continues:

"However, they would not be in place or the lanyard would not be in place when the vessel was in drydock in a shipyard, they would have been removed to allow for free operation."

This is thought to explain that Marine did not fail in any duty in the particular respect suggested. No other act of neglect is relied upon to bring into operation the impact of the indemnity clauses of the contract, or otherwise.

■ The evidence is deemed not to disclose negligence on the part of Marine in the performance of its contractual duties, and it is so found.

It is further urged that Lester was guilty of contributory negligence because he "chose to use the trunk cabin roof rather than the safer method of using the grab rail on the starboard side of the pilot house door and stepping on the main deck."

The argument is a better tribute to conscientious advocacy than to the realities of the situation. Lester's task was to test the running lights on the mast which was stepped at the aft bulkhead of the pilot house, as shown in Exhibit 2. He could not have been expected to perform that task adequately by stepping down to the passageway alongside the cabin, which constituted the main deck at that part of the vessel. In other words, he did not choose the less safe of two methods to accomplish a given task, for there was no apparent choice offered to him.

■ The finding therefore is that no contributory negligence on the part of the libelant has been shown.

The question of the amount to be awarded to libelant involves the following considerations:

Libelant was 39 years of age at the time of the accident.

The Nature and Extent of the Injuries

Fractures of the tibia and fibula in each of his legs, the condition of the left leg being much more serious than that of the right; as to the former the fractures were comminuted and that of the left tibia was compound and the wound was approximately one inch long, indicating that either something punctured through to the bone or the bone had gone

through the skin. A bone reduction was performed on this leg and two metal screws were put in to hold the fragments in as near to a proper relation as could be obtained.

Examination in November of 1954 revealed that at about 3″ above the ankle there was a marked angulation of the leg with bowing to the outside. At the point of angulation there was thickening of the soft tissue, the skin was dark, thick, and presented an edematosed swelling. The soft tissue thickening which was hard and firm was the result of an inflammatory process. There was a two inch greater circumference just above the ankle of this leg, as compared to the right. The left leg was shorter between the knee and the ankle than the right because the left leg is angled, the difference between the lengths of the two legs being five-eighths of an inch.

There was a limitation of motion in this ankle as to flexion and extension of over 30 or 40%; lateral motion of the ankle was completely obliterated. Thus there was more than 50% impairment of motion in the left ankle due to the entire loss of lateral motion. The result of the bowing is that the weight bearing line falls to the outer side of the foot instead of the middle of the ankle joint which would be normal. Thus the outer edge of the foot gets the weight of the body rather than the entire sole.

As to the right leg, the results are described as fairly good with some impairment of motion in the right ankle not to exceed 20% and probably less.

The use of the screws in the effort to treat the fracture in the left leg has resulted in an X-ray disclosure that they are getting loose so that the point of a screw does not engage one fragment of the bone; this created an inflammatory process which would make it desirable to remove at least one screw, which procedure in the language of the medical witness, is "more or less of a risky proposition."

As to the left leg again, there is an incomplete union at the site of the fracture of the tibia and the only reason why the libelant can walk on his left leg is that the lower portion of the fibula has grown fast to the fragment of the tibia which is the weight-bearing bone, and he is really walking through his fibula "which was not intended by nature but that is the way he is getting his ability to walk today."

Whether the indicated operation would be successful is a matter of surgical opinion which necessarily in turn would be governed by the response that the individual is able to make.

Lester remained in the hospital to which he was taken immediately after the accident, until August 12, 1947, and the details of the operative procedure appear in the hospital records and do not require recital at this time. He reentered another hospital for treatment on October 29, 1947 and there remained until November 6, 1947, and thereafter although not hospitalized he received medical treatment until May 20, 1949.

### Earning Capacity

The libelant has been able to resume activity in several capacities other than the one in which he was engaged at the time of the accident; in all of these, including his present one, he has earned at least as much as he did as an electrician, namely $55.20 for a forty-hour week, so that in the financial sense he has not lost his earning capacity, but whether it is as high as it would have been had he been able to remain in the calling of his choice, is conjectural and has not been the subject of testimony.

### Compensation Payments

The payments of compensation to the libelant are stated by his counsel to have amounted to $3,927.85; and the medical expenses to date have been $1,064.50. The latter figure has been verified by reference to the notes made by the court at the trial, and in this respect differs from the transcript.

Under all the circumstances it seems that the decree should contain an award of $18,000 to the libelant against

the respondent, with costs, as fairly compensatory, and must therefore so provide; and that the impleading petition be dismissed.

Settle decree.