94 So.2d 715 (1957)
Mrs. Agnes L. BABIN et al.
v.
LYKES BROS. STEAMSHIP CO., Inc.
No. 20749.
Court of Appeal of Louisiana, Orleans.
April 15, 1957.
Rehearing Denied May 13, 1957.
Writ of Certiorari Denied June 28, 1957.
Elmer D. Flanders and Nicholas Masters, New Orleans, for plaintiffs-appellants.
Terriberry, Young, Rault & Carroll, Andrew R. Martinez and Edward S. Bagley, New Orleans, for defendant-appellee.
JANVIER, Judge.
This suit for damages is brought under Article 2315 of our LSA-Civil Code by the widow and minor daughter of Thomas Babin who, while performing his duties as a longshoreman in the employ of New Orleans Stevedoring Company, Inc., on board a steamship which was moored at a wharf in New Orleans, fell from the deck of the vessel into the Mississippi River and was drowned.
The defendant is Lykes Bros. Steamship Company, Inc., the owner of the vessel. It is essential that the relationship between the parties be clearly understood. The owner of the vessel was not doing the loading and unloading. The cargo space contained in the vessel had been chartered to the United States Army and the Army, through a stevedoring company employed by it, was doing the loading. All that the owner of the vessel was required to do was to furnish the vessel itself. Such a situation and the resulting obligations are well set forth in an opinion rendered by the United States Circuit Court of Appeals for the Fifth Circuit in Freeman v. A. H. Bull S.S. Co., 125 F.2d 774, 775:
"It will be noted that the vessel was under charter, and had no control over the loading and unloading or knowledge *716 of the condition of the cargo. Freeman was not an employee of the vessel, but of Block's Terminal, Inc., [the stevedore] which in turn was employed by Ashcraft-Wilkinson Company [the charterer]. Authorities cited on the undelegable duty of a master to furnish his servant a safe place to work have no application to this vessel. If she was herself in safe condition and her appliances good, and warning given of any hidden danger known to her, her duty was fulfilled to the charterer and his employees when they came aboard to get his cargo. * * *" (Brackets ours).
It should also be noted that, as already stated, this is a suit under Article 2315 of our LSA-Civil Code, and it is conceded that it is therefore controlled by the ordinary rules of negligence arising under that article of our Code. Any admiralty or maritime cause of action, including any possible charge as to the unseaworthiness of the vessel, was abated by the death of Babin. Western Fuel Co. v. Garcia, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210; Graham v. A. Lusi, Limited, 5 Cir., 206 F.2d 223.
It is charged that the death of Babin resulted from negligence in that the steamship company failed in its duty to furnish to the said Babin a safe place to work for the reason that, at the time of the accident, the chain guard rails were not in position along the starboard side of the vessel at the point at which Babin fell into the river.
While it is also charged that there was grease on the deck of the vessel and that this made the place in which Babin was working unsafe, there is absolutely nothing in the record which supports this charge.
The defendant denied any negligence and charged in the alternative that Babin himself was contributorily negligent, and also that he fell from the deck of the vessel as a result of a risk which was associated with his work and which he had voluntarily assumed.
In the Civil District Court for the Parish of Orleans there was judgment dismissing the suit and plaintiffs have appealed.
The steamship, which was involved, was the SS Howell Lykes. On its arrival at New Orleans it had first docked at the Celeste Street wharf and had there taken on cargo, which had been loaded by longshoremen employed by a stevedoring company, which was not identified but which was probably other than that by which Babin was employed at the time of the accident.
At the Celeste Street wharf the vessel had been docked with its starboard or righthand side against the wharf and cargo had been loaded from the wharf on its starboard side into the vessel and particularly into hatch number three alongside which Babin was working when he later fell into the river.
As this vessel and many others are constructed, there is a high permanent guard rail which entirely surrounds the deck of the vessel except at points immediately alongside the several hatches and, at these open spaces adjacent to the hatches, there are provided removable chain guard rails which are composed of iron stanchions which fit into holes in the deck and which provide support for the chains which pass from one stanchion to another and afford protection against the possibility of anyone falling into the water through the spaces which would otherwise be unprotected. These chain guard rails are removable so that cargo may be more easily moved to and from the hatches, and it is shown that, when they are removed, the stevedoring company which is working the vessel hangs between the vessel and the wharf a net called a "save-all."
When the vessel was moored at the Celeste Street dock, the chain rail alongside the starboard side of the number three *717 hatch had been removed so that cargo could be loaded into that hatch without the danger that the hooks and other paraphernalia used on the loading booms, which are employed by the longshoremen, might strike and pick up and swing the chain rail and create additional hazards to those working the ship.
When the loading at the Celeste Street wharf was completed, the vessel was moved to the dock at the Port of Embarkation of the United States Army and at that dock was again moored with its starboard side against the wharf. Since the movement from the Celeste Street wharf to the wharf of the Port of Embarkation required only a very short time, the chain rail alongside the number three hatch which had been removed at the Celeste Street wharf was not replaced but in its place the crew of the vessel strung a temporary rope barrier across the opening in the rail. After the vessel was moored at the Port of Embarkation, loading was commenced into the number three hatch and, though counsel for plaintiffs vehemently assert that the record shows that no loading was commenced from the wharf to the hatch and that the only loading which took place was from a barge on the other side into that hatch, the record overwhelmingly shows that not only were preparations made to load from the wharf on the starboard side into that hatch but that considerable cargo was actually loaded from the wharf on that side.
The hatch covers or "pontoons" as they are called had been removed from the number three hatch and placed alongside that hatch between it and the starboard side of the vessel and on top of these pontoons had been placed the heavy tarpaulin which covers the pontoons when they are on the hatches. Babin and another employee of the stevedoring company were instructed to move the tarpaulin from its position on top of those pontoons and, while doing so, Babin, in some unexplained way, fell into the river and was drowned.
There is no contradiction of the evidence offered by defendants to the effect that the temporary rope rail which had been strung across the opening by the crew of the vessel had been removed by members of the stevedoring company and not by the crew, and counsel for defendant point to this fact as indicating that even had the chain rail been replaced by the crew when the vessel left the Celeste Street wharf, it would have been removed by the longshoremen when they were preparing to load cargo from the wharf into the number three hatch of the vessel. And the record abundantly shows that when it becomes advisable to remove these chain rails, the removal is effected by longshoremen and not by the crew of the vessel. It is overwhelmingly shown that the purpose of removing these chain rails while cargo is being loaded or unloaded is twofold; first, it is conceded that these rails, when in position, create an added hazard because of the fact that the lifting booms on the vessel are equipped with various kinds of devices such as tongs or other equipment and that if the rails are left in place this equipment sometimes catches the rails and swings them into the air creating a hazard to those working on the vessel or on the dock.
There is almost no denial of the fact that these guard rails are always removed when the stage of the water in which the ship is lying in such that the top of the guard rails are above the wharf alongside which the ship is lying, but there is some evidence to the effect that when these rails are below the height of the wharf, it is not necessary to remove them. We think the evidence preponderates to the effect that it is advisable to remove them in all cases but there is no doubt at all that it substantially preponderates to the effect that it is always advisable to remove them when the rails, if left in place, would extend above the height of the wharf.
In spite of the vehement contention of counsel for plaintiff that this rail, had it been in place, would not have extended above the wharf, we think the record justifies a conclusion to the contrary.
*718 One of the photographs taken after the accident and after considerable cargo had been loaded into the vessel at the Port of Embarkation shows at least one of the stanchions extended a few inches above the wharf and the ship's records, identified and explained by two officers of the vessel, show that, as a result of cargo loading, the vessel had sunk about eleven inches between the time it was moored at the wharf of the Port of Embarkation and time at which the accident occurred. This would indicate that when the vessel arrived at that wharf the rail, had it been in place, would have extended above the wharf some 10 or 12 inches. From this fact it seems clear that even had that rail been in place, it would have been removed by the longshoremen in preparation for loading cargo from the dock on the starboard side of the vessel.
That the rails should have been removed even if the top of the rail was slightly below the dock is made evident by other testimony to the effect that passing vessels often cause a swell with a result that a vessel moored to the wharf sometimes rises and falls as much as twelve to eighteen inches.
We think it unnecessary to set forth in detail the testimony of the witnesses which, we think, shows conclusively that it is dangerous to leave such a rail in position during loading operations. This evidence substantially predominates.
Furthermore, it is shown by one of the witnesses produced by plaintiff that the net, called the "save-all", had been strung on that side of the vessel between the ship and the wharf and there is uncontradicted evidence to the effect that when such a "save-all" is strung, the rail must be removed as the "save-all" is so heavy that the rail has not sufficient strength to support it.
Our conclusion on this question is that there was no negligence on the part of the ship or the members of its crew in not replacing the chain rail when the vessel left the Celeste Street wharf and that there was no negligence on their part in permitting the preparations to be made by the longshoremen for loading cargo from the wharf on the starboard side of the ship into the hatch without requiring that the chain rail be replaced.
It is contended that such a ship is unseaworthy when the chain rails are not in position and there can be no doubt that if a ship of that kind was permitted to put to sea without the chain rails in position it would be held to be unseaworthy, but we cannot say that such a ship is unseaworthy just because the rails are removed while the vessel is moored alongside such a wharf as that which is at the Port of Embarkation and elsewhere at the Port of New Orleans.
In the contention that the failure to have such a guard rail in place renders the vessel unseaworthy, counsel for plaintiff rely heavily on a decision of the United States District Court for the Eastern District of New York, in Lester v. United States, 127 F.Supp. 413, in which the Court held a vessel to be unseaworthy since no rail was provided. One distinction between that case and this lies in the fact that here, although a rail was provided, the stevedoring company did not choose to make use of it, and furthermore, the Lester case was reversed by the United States Court of Appeals for the Second Circuit. See 234 F.2d 625, 628. In its opinion, reversing that decision, the Court said:
"* * * In Hanrahan v. Pacific Transport Co., 2 Cir., 1919, 262 F. 951, certiorari denied 252 U.S. 579, 40 S.Ct. 345, 64 L.Ed. 726, we held that a ship which was in port and fast to a pier was not unseaworthy as to a crewman who had fallen overboard from an upper deck because it lacked hand rails: `Seaworthiness is a relative term; a vessel may have that quality in port, and yet be wholly unfit for rough water, McLanahan v. Universal Insurance Co., 1 Pet. 170, 7 L.Ed. 98; and to say that this ship was unseaworthy because *719 she had no handrail up, while lying alongside a wharf discharging cargo, is merely untrue.' 262 F. at page 952. See, also, Newport News Shipbuilding & Dry Dock Co. v. Watson, 4 Cir., 1927, 19 F.2d 832; Brick v. Long Island R. Co., 1927, 245 N.Y. 222, 157 N.E. 93. We think these precedents are authoritative under the circumstances presented here. * * *"
It is true that a writ of certiorari is presently pending in the Lester case.
In view of the fact that we find no negligence whatever on the part of the owner of the steamship, it is not necessary that we discuss the question of whether there was contributory negligence or whether the death of Babin resulted from a risk assumed by him.
The reasons given for judgment by the District Judge are concise but so completely comprehensive that we deem it advisable to repeat them here even though we have ourselves set forth practically all of the reasons given by the District Judge:
"Plaintiffs, Agnes L. Babin, the widow of Thomas L. Babin, and Sandra Babin, the minor daughter, through her tutrix, bring this suit for damages arising out of the death of Thomas L. Babin, the deceased husband and father of the respective plaintiffs. Babin met his death on September 4, 1953, when he fell from the deck of the SS Howell Lykes, into the Mississippi River while this ship was moored alongside the dock at the U. S. Army Port of Embarkation at New Orleans. Death was by drowning.
"The evidence shows that Thomas L. Babin was employed as a stevedore by the New Orleans Stevedoring Company, Inc., an independent contractor employed by the space charterer, the United States Army.
"The SS Howell Lykes had been shifted from the Celeste Street Wharf of the Dock Board, to the U.S. Army Port of Embarkation, at about 6:30 p. m. on September 2. On September 3, stevedoring gangs of the New Orleans Stevedoring Company, Inc., had conducted loading operations at the No. 3 hatch of the vessel. On September 4 the vessel was not worked until 6:00 P.M. because of rain. She was loading cargo from her port side at the Port of Embarkation wharf.
"The deceased went aboard on 6: P.M. on September 3 to resume loading operations. The pontoons, or hatch covers, had been removed. The deceased and Arnold Hingle, a fellow employee of the New Orleans Stevedoring Company, were directed to roll a tarpaulin off the pontoons. The deceased, Babin, was walking along the outboard side of the pontoons in order to perform this task with Hingle, and when this task was finished he took a few steps backward and sideward and fell over the side of the ship, into the river, and drowned.
"This action is brought under Article 2315 of the [LSA] Civil Code, alleging negligence on the part of the owners of the vessel, Lykes Bros. Steamship Company, Inc. It is governed by the ordinary rules of negligence prevailing under the Civil Code of Louisiana.
"The defendant in his answer denies any negligence on the part of the ship owner, and sets up the defenses of contributory negligence and assumption of risk.
"The record shows that the SS Howell Lykes was equipped with ordinary removable chain railings, and the evidence in the record shows that it is the custom, throughout the world, in the loading and unloading of cargo vessels to remove the chain railings, whether the deck of the vessel be below or above the dock. According to the testimony of the witnesses this is done because *720 the railing itself creates a hazard during loading and unloading operations.
"The record shows that the deceased knew the railing was down because he and Hingle, the fellow employee, attached the save-all net, which is a rope net attached to the deck of the ship and to the dock, at a point where the cargo slings pass back and forth between the ship and the dock, for the purpose of saving cargo which may drop out of the slings, to prevent it from dropping into the water.
"The testimony shows that it is necessary to remove the chain railings in order to attach a save-all net. The record shows further that the stevedores themselves removed the chain railing, and that the ship's officers, when she left the Celeste Street Wharf, provided a rope railing in its place and stead, which was in turn removed by the stevedores when the ship reached the Port of Embarkation.
"Considering the employment of the deceased, in the opinion of this court the absence of the chain railing at the time of the accident did not constitute negligence on the part of the ship owner in its duty to the deceased
"As previously stated, Babin, the deceased, was employed by the New Orleans Stevedoring Company which was engaged by the United States Army over which the ship owner had no control, and it was the employees of the stevedoring company who removed the chain railing in order to perform the tasks of loading and unloading, and the deceased knew that the railing was down.
"Considering the employment of the defendant, it is the opinion of this court that there was no breach of duty, or negligence, on the part of the defendant herein.
"Accordingly, there will be judgment dismissing plaintiffs' suit at their cost."
The judgment appealed from is affirmed at the cost of appellants.
Affirmed.