THOMAS MORAN, PLAINTIFF-APPELLANT, v. MOORE-McCORMACK LINES, A CORPORATION, DEFENDANT-RESPONDENT.

Submitted January 18, 1944—Decided March 31, 1944.

Before BROGAN, CHIEF JUSTICE, and Justices BODINE and COLIE.

For the plaintiff-appellant, *Albert J. Shea.*

For the defendant-respondent, *Cox & Walburg (Harry E. Walburg,* of counsel).

The opinion of the court was delivered by

BROGAN, CHIEF JUSTICE. The plaintiff has appealed from a judgment of nonsuit in the Hudson County Court of Common Pleas. His action was for personal injuries. The cause

of action was stated in two counts. At the trial the first count was abandoned. The second count asserted negligence on the part of the defendant, which was the proximate cause of the plaintiff's injuries. The asserted negligence was that the defendant provided a "skid" or platform for the use of the plaintiff in the performance of his work as a stevedore "which contrivance collapsed by reason of the fact that the eye-bolt to which the platform was fastened by means of rope, was rotted, rusted and in a very weak condition." Further, that defendant failed in its duty "to provide a proper and safe method for means of erecting said skid to the pier in such a manner that the men could work in safety   *   *   * and that defendant directed that said platform or skid be fastened to an eye-bolt which was rusted, rotted and in a very weak condition and unfit for the uses for which it was intended."

The facts developed in the testimony taken at the trial present the following situation: The plaintiff, Thomas Moran, was a longshoreman employed by the Bayridge Operating Company, an independent contractor. On February 24th, 1941, the defendant, Moore-McCormack Lines, a corporation, was lessee of a certain pier on the Hudson River in the City of Hoboken. On that day the steamship *Arabian Prince,* owned by Prince Line, Ltd. occupied the berth on the northerly side of the pier. A steamship of the defendant, the *Moore-Mack,* occupied the berth on the southerly side of the pier. The business in which plaintiff was engaged was the unloading of heavy rolls of newsprint paper from the *Arabian Prince* at the upper level of the pier. The paper was then transferred to the *Moore-Mack* by the defendant's own employees or agents. No relationship of master and servant existed between the plaintiff and the defendant. The unloading of the cargo was in the hands of a crew of men, which included the plaintiff, employees of the Bayridge Operating Company. To unload the cargo properly it was necessary to use a skid. This may be described as a stout planking or platform twelve feet long by six wide on which the particular load is deposited as it is removed from the ship. The rolls of paper, each weighing a ton, were removed

from the hold of the *Arabian Prince* by the plaintiff and his fellow employees, rolled across the pier toward the south side, whence it was transferred by defendant's employees to the defendant's ship, *Moore-Mack*. Before this particular operation was started the plaintiff, Moran, was sent by his superior to obtain a skid. He got one from Dennis Crowley, the defendant's foreman. The skid weighs five or six hundred pounds and it was wheeled on hand trucks into position opposite the hatch door and made ready for service by the plaintiff and five or six other men. The plaintiff claimed that Crowley superintended and directed the operation of making the skid ready for use in the unloading of the cargo. It is a bare inference that the men who assisted Moran in this undertaking, under Crowley's direction, were defendant's employees. The proof, however, is very sparse. The skid was made fast to the pier at four or five points. These anchor points to which the skid was tied were on the pier platform except one, a ring bolt which was attached to the side of the pier. One of the exhibits in the case—a photograph—indicates that this ring bolt was affixed to an iron or steel upright of the girder type.

The unloading was done by lifting the rolls of paper in a net by means of a boom and cable, moving the load into position and lowering it on the skid which rested on the pier deck and extended out over the edge of the pier towards the ship. The plaintiff stood at the outer end of the skid and it was his task to steady the load as it was lowered before it was dropped on the skid. He had been engaged in this particular assignment for about an hour when the skid, upon receiving the impact from the load, broke loose from the fastening point affixed to the girder, and plaintiff was thrown into the water and suffered serious injuries.

The learned trial judge directed a judgment of nonsuit at the end of the entire case. It is our view that the judgment was correct—based as it was on the plaintiff's failure to prove the asserted negligence on the part of the defendant.

The plaintiff had the burden of proving by a preponderance of the evidence that the defendant was negligent in the particulars relied upon. The bolt which collapsed and

caused the plaintiff's injuries was, without doubt, of inferior quality. There was no proof, however, that this defective condition was known to the defendant—assuming that the defendant undertook to prepare the skid for the plaintiff's use. The evidence offered by the defendant was what might be considered a demonstration that it had no knowledge or notice of the vice in the ring bolt.

The witness, Fezandie, a graduate engineer of experience and presently on the teaching staff in the department of mechanical engineering in Stevens Institute of Technology, testified that he examined the ring bolt which collapsed; that micro-photographs of its structure were taken; that the ring bolt was made of what is known as "faggotted" wrought iron or bushel wrought iron; that his examination by sawing off part of the bolt permitted him to determine the nature and characteristics of the metal inside the ring bolt at the point of fracture. He said that the metal was inferior, containing "slag," a waste product of inferior durability; that the slag was on the inside of the bolt. Its effect on the ring bolt was to prevent a close knit or union in the metal and resulted in a consequent inferiority in its strength. He also stated that this defect was inside the bolt and could not be discovered by any ordinary inspection and that the use of this bolt as an anchor for the skid subjected it to a greater strain than it could withstand; that he could not discover whether the bolt was defective by any inspection of it; that its inferiority could not be determined except by taking micro-photographs. In fine, his testimony, which was not rebutted in any way, compelled the conclusion that the bolt in question had a latent defect. In these circumstances, we think the nonsuit was right as actionable negligence on the part of the defendant was not proved, nor were any facts proved from which such negligence might reasonably be inferred. *Res ipsa loquitur* as a rule of evidence is not applicable to the facts under consideration and even if it were it would make no difference in the result. The facts in proof are quite within the doctrine of *Bien* v. *Unger,* 64 *N. J. L.* 596; compare *Holmes* v. *Pelligrino,* 102 *Id.* 697.

The judgment of nonsuit should be affirmed, with costs.