Olga SKOVGAARD, Administratrix ad Prosequendum of the Estate of Carl E. Skovgaard, deceased, Libelant,

v.

THE vessel m/v TUNGUS, her boilers, etc., and Den Norske Afrika-og Australielinie Wilhelmsens Dampskibsaktieselskab, et al., Respondents,

and

El Dorado Oil Works, Respondent-Impleaded.

Civ. A. No. 12–55.

United States District Court
D. New Jersey.
June 11, 1956.

---

Baker, Garber & Chazen, Hoboken, N. J., for libelant, by Nathan Baker, Hoboken, N. J.

McAleer, Connell & Corridan, Jersey City, N. J., for respondents. Haight, Gardner, Poor & Havens, New York City, by J. Ward O'Neill, and David P. H. Watson, New York City, of counsel.

Wilbur A. Stevens, Newark, N. J., for respondent-impleaded. Kirlin, Campbell & Keating, New York City, by Joseph M. Cunningham, New York City, of counsel.

MODARELLI, District Judge.

In October, 1952, at a foreign port, coconut oil was loaded into the two deep

tanks of No. 3 shelter deck of the respondent cargo vessel m/v Tungus. On December 5, 1952, at 5:30 p. m., she docked at a Bayonne, New Jersey, pier. The owner of the oil in the port deep tank having arranged with respondent-impleaded, El Dorado Oil Works, to discharge and store the oil, cargo surveyors and El Dorado workers went aboard to prepare for the discharge of the oil from the port tank.

Under the supervision of the El Dorado workers, two of the ship's crew operated winches; they were aided by one officer of the ship; the port deep tank lid was lifted, rotated 90°, and lowered to a position across the top of its coamings so that the after third of the tank was open. The El Dorado workers were satisfied with the position of the tank lid. A pump, owned by El Dorado, was lifted by the ship's winches and lowered into No. 3 shelter deck and placed on top of the port deep tank lid under directions of an El Dorado worker; he also directed the rigging of the suction and discharge hoses. Two hatch beams were lying side by side between the port and starboard deep tank coamings; the beams were used when dry cargo was carried in the tanks. The location of the beams was the normal storage place during the hauling of liquid cargo. The testimony of Wagner, who was employed by El Dorado as a maintenance machinist describes the condition of the pump prior to its use:

"A. I received—that morning I received orders from my supervisor, Mr. Skovgaard, [his death is the basis of this action] to repair the pump, check it, because the ship is coming in later that day. I went down to where it was, in the mill building below the machine shop, and I went through my routine inspection, re-aligned the gears, and I told Carl [Skovgaard] what else I can do.

"He told me it would be a good idea to go ahead. I put four pins in the legs of the pump to secure it to the base so she don't shift on us.

I also put new packing in, in the glands, and new fins inside the pump.

"Q. New what? A. Fins, blades that bring up the oil.

"Q. After you were finished with this inspection and repair of the pump, what did you do? A. I called it to the attention of Mr. Skovgaard. We both went over it. We turned it by hand to make sure it is workable, and everything, and we were both satisfied that she was in good working condition.

\* \* \* \* \* \*

"Q. But when you and Carl Skovgaard were finished inspecting the pump, and you were both convinced that it was working properly—A. Yes, sir.

"Q. —what did you do with it then, did you put it on the pier to await the arrival of the ship? A. Yes, They took it on what they call a stringpiece, or something, on the side of the pier and put it there." (Transcript, pp. 542–543).

At 8:05 p. m., December 5, 1952, El Dorado's workers began to discharge the oil from the tank of the m/v Tungus. Attached to the pump was an air injection nipple, which was not an integral part of the pump but was made by El Dorado workers out of parts in stock and then attached to the pump. The ship's log book entry for December 6 describes the next event, which occurred at 12:15 a. m.:

"At 0015 the oil connection burst where the steam pipeline is screwed on to same, becoming leaky. The leakage was detected by the ship's 3rd Officer who was on watch. The 3rd Officer tried immediately to call men from the pump crew, but it was found that none of the pump crew was on board. Before the 3rd Officer had succeeded in getting hold of the men which were down on the dock the connection was broken off and the coconut oil gushed out into the starboard side of the shelter deck

and down through the hatch covers in the forward part of the tank into the No. 3 lower hold. The pump was stopped immediately as the men came on board. The oil, however, continued to pass through the leaky place as the oil was running back through the oil hose. However, one succeeded in stopping the leakage by inserting a plug, but not before several tons of oil had run into the deck and lower hold.

"The oil stained about 50 paper bags desiccated coconut bound for Boston stowed in the starboard side of the shelter deck.

"The oil ran underneath mahogany lumber which was stowed in the after part of the shelter deck in No. 3. It continued through the shelter deck into No. 4 under bales of rugs which were stowed there. In the lower hold No. 3 are stowed steel plates, scrap brass metal and mahogany lumber."

As a result of the oil spill, liquid coconut oil covered the entire area surrounding the pumping operation, including the top of both tank lids, the area forward of the tank coamings and between the port and starboard tank coamings. After the pump had been stopped the chief officer of the ship and the cargo surveyors went into the shelter deck to ascertain the exent of the cargo damage. Donohue and Russo, El Dorado employees, then replaced the broken fitting on the pump after "squeegeeing" * the spilled oil from a working area sufficient to repair the pump. The deceased Skovgaard, a maintenance foreman employed by El Dorado, was called from his home to assist in repairing the pump and restoring it to operation. At 1:25 a. m., he boarded the vessel. Since Donohue and Russo still were working on the disabled pump, he went down into No. 3 shelter deck to assist them. In moving from the foot of the ladder leading down from the main deck to the shelter deck, Skovgaard walked through the area over which the oil had spilled. As he walked aft of the port tank, he stepped on either one or both of the hatch beams; then as he attempted to step onto the top of the tank he slipped on the spilled oil and fell to his death into 8 feet of hot oil contained in the hatch opening of the port tank.

■■ Libelant argues that she has two separate causes of action: One, under the New Jersey Wrongful Death Act, N.J.S.A. 2A:31–1 et seq., for negligence and the other under the general maritime law of unseaworthiness. The question already has been decided. In Levinson v. Deupree, 1953, 345 U.S. 648, 650, 73 S.Ct. 914, 915, 97 L.Ed. 1319, the Court held that "The maritime law does not allow recovery for wrongful death. The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358; Butler v. Boston & Savannah Steamship Co., 130 U.S. 527, 555, 9 S.Ct. 612, 618, 32 L.Ed. 1017. In 1920, Congress adopted a Lord Campbell's Act restricted to deaths on the high seas, 41 Stat. 537 et seq., 46 U.S.C. § 761 et seq. * * *." In Just v. Chambers, 1941, 312 U.S. 383, 388, 389, 61 S.Ct. 687, 692, 85 L.Ed. 903, " * * this Court, upon an elaborate review of the decisions, concluded that no suit for wrongful death would lie 'in the courts of the United States under the general maritime law'. The Harrisburg, 119 U.S. 199, 213, 7 S.Ct. 140, 146, 30 L.Ed. 358. See, also, The Corsair, 145 U.S. 335, 344, 12 S.Ct. 949, 951, 36 L.Ed. 727. The absence of a federal or state statute giving a right of action was emphasized. But when a State, acting within its province, has created liability for wrongful death, the admiralty will enforce it." Further, 312 U.S. at page 391, 61 S.Ct. at page 693, the Court said: " * * * The pith of the matter is that the maritime law, as we conceived it, did not permit recovery, [in the case of wrongful death] and in the same sense * * *." The Court of Appeals for this Circuit also has spoken; in Klingseisen v. Costanzo Transp. Co., 3 Cir., 1939, 101 F.2d

* Done by the use of a squeezeable mop.

902, 903: "* * * In the case at bar, we may not apply the familiar rule of admiralty where contributory negligence serves to divide the damages. It is settled that no suit may be brought to recover damages for death in an admiralty court of the United States under general maritime law. Such a right exists solely by statute. The appellant has based her suit upon a statute of Pennsylvania. * * *"

Thus it is clear that libelant's recovery, if any, is under the New Jersey Death Act, N.J.S.A. 2A:31–1.

Incidentally, the respondent and respondent-impleaded both refer to a proceeding instituted by the libelant in the New Jersey Department of Labor and Industry, Division of Workmen's Compensation, Hudson County District, in which the then respondent, El Dorado Oil Works, questioned the jurisdiction of the New Jersey Compensation Bureau, alleging that jurisdiction was under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq. In his decision, Deputy Director Lorenz held that the New Jersey Department of Labor and Industry, Division of Workmen's Compensation, had jurisdiction over the petition seeking compensation for the death of Carl E. Skovgaard, holding "that, being in the twilight zone, the decedent, *not being connected in any way with the operation of the ship,* I find comes under the protection of this Division." (Emphasis supplied.) A compensation award was accordingly made for the payment to the widow, libelant herein, until May 12, 1969, at which time the youngest child of the decedent will reach the age of 18.

The libelant alleges that respondent's negligence consisted of: (1) Allowing the port tank to remain partly open without placing ropes or other barriers around it, (2) inadequate lighting in the shelter deck, (3) placing iron beams in the walking space between the two tanks, (4) leaving oil on the deck, tank lid, beams, and in the walkway between the tanks near an open, unguarded tank.

As to (1), there was no negligence in allowing the tank to remain open as part of the cargo unloading operation. The tank opening was necessary to discharge the oil. See Long v. Silver Line, 2 Cir., 1931, 48 F.2d 15; The Kongosan Maru, 9 Cir., 1923, 292 F. 801, 803, 804; The Louisiana, 5 Cir., 1896, 74 F. 748, 750, 751.

As to (2), on the night of Skovgaard's death there were four permanent deck lights forward and aft of the hatch, and two reflectors with 500 ampere bulbs immediately after the hatch; there were also four regular cargo lights shining directly into No. 3 shelter deck. Additionally, the lighting in the hatch was adequate for two surveyors to make their calculations and for Donohue and Russo to replace the sheared-off air injection nipple.

As to (3), libelant cites only Cooney v. United States, D.C.W.D.Wash. 1946, 74 F.Supp. 26. In that case, hatch boards had been piled or loosely thrown on deck, causing the ship's deck engineer to fall when he stepped on the pile while he was walking along the deck. The court concluded that there had been a negligent piling of the boards. The case does not hold that the mere presence of boards is negligence but only that an improper piling of boards is a negligent condition. Here, there is no proof that the iron beams were unfit to walk upon, aside from the fact that they were covered with oil, which will be discussed. Moreover, the facts are inconsistent with the theory that the presence of the beams caused Skovgaard to fall into the tank. His fall was caused by slipping when he had at least one foot already on the lid.

As to (4), the issue correctly is stated by respondent: Whether during the repair operations it was the vessel's duty to the deceased to clean up the oil spill. Respondent forcefully contends that "Not a single authority has been cited by proctor for libellant which spells out a duty on the part of the vessel to clean up an oil spill caused by the very parties whose sole duty and function it

was to discharge the oil properly, and whose employee it is who is now attempting to recover." The court agrees. In support of her proposition that it was the vessel's duty to clean up the oil spill, libelant cites Anderson v. Lorentzen, 2 Cir., 1947, 160 F.2d 173; Fodera v. Booth American Shipping Corporation, 2 Cir., 1947, 159 F.2d 795; Santamaria v. Lamport & Holt Line, E. & A. 1938, 119 N.J. L. 467, 196 A. 706; McFall v. Compagnie Maritime Belge, 1952, 304 N.Y. 314, 107 N.E.2d 463. None of those cases aid libelant. The negligence of the vessel in the Anderson case was in its failure to warn a longshoreman of the dangerous nature of the cargo. Here, however, the dangerous oil spill was known to Skovgaard. In Fodera, the negligence clearly was that of the shipowner and not, as here, that of the injured party's fellow employees. Santamaria does not hold that a shipowner is liable to a worker for a condition created by his fellow emloyees. Moreover, under New Jersey law when the employee of an independent contractor enters property at the instance of the owner to correct the precise condition which later causes the employee's injuries, the owner is not liable unless he supervised or controlled the employee. Broecker v. Armstrong Cork Co., E. & A. 1942, 128 N.J.L. 3, 24 A.2d 194. Here, Skovgaard boarded the vessel to help repair the defect and restore to operation the pump which caused the oil spill. The entire repair operation was conducted by El Dorado, and there is no evidence from which to infer that any m/v Tungus personnel supervised or controlled either the discharge of the oil from the tank or the repair of the pump. In McFall, the court held that a longshoreman who is employed by an independent contractor *engaged by the owner* to load its ship, is an invitee aboard the vessel. "As such he is entitled to a reasonably safe place to work. The duty of exercising reasonable diligence to provide such a place and warn the longshoremen of hidden dangers devolves upon the owner of the ship. * * *" 304 N.Y. at page 324, 107 N.E.2d at page 468.

Here, however, the independent contractor El Dorado was engaged by the owner of the cargo who was not the owner of the ship.

I am not persuaded that the owner of the vessel is under any duty to protect the workmen of the independent contractor, El Dorado Oil Works, engaged by the owners of the cargo of coconut oil, against the dangerous conditions created by the very work for which the independent contractor was hired. Accordingly, the court finds that the respondents are not liable for Skovgaard's unfortunate death and the libel must be dismissed.

The foregoing opinion shall constitute findings of fact and conclusions of law, as required by Rule 52, 28 U.S.C.

An order may be submitted in conformity with the opinion herein expressed.