241 F.2d 30
 Margaret Jean CURTIS, Administratrix D.B.N. of The Estate of
William Thomas, Deceased, Appellant,
v.
A. GARCIA Y CIA., Ltda. (two cases).
Luther MONTGOMERY
v.
A. GARCIA Y CIA., Ltda.
George HUDSON
v.
A. GARCIA Y CIA., Ltda.
Daniel SEAWRIGHT
v.
A. GARCIA Y CIA., Ltda.
Willie WILSON
v.
A. GARCIA Y CIA., Ltda.
Robert BROWN
v.
A. GARCIA Y CIA., Ltda.
Anthony TAYLOR
v.
A. GARCIA Y CIA., Ltda.
 Nos. 11993-12000.
 United States Court of Appeals Third Circuit.
 Argued Dec. 7, 1956.
Decided Jan. 21, 1957.
Rehearing Denied March 7, 1957.
 
 1
 Mark D. Alspach, Philadelphia, Pa., (Joseph J. Murphy, Krusen, Evans & Shaw, Philadelphia, Pa., on the brief), for A. Garcia y Cia., Ltda.
 
 
 2
 William M. Alper, Philadelphia, Pa., (Abraham E. Freedman, W. R. Lorry, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for Curtis and others.
 
 
 3
 Before BIGGS, Chief Judge, KALODNER, Circuit Judge, and KRAFT, District judge.
 
 
 4
 KRAFT, District Judge.
 
 
 5
 The seven civil actions from which the present eight appeals arise were brought by six longshoremen and the administratrix of the estate of a deceased longshoreman. They stem from a maritime accident aboard the S.S. 'Atlantico' on February 14, 1952, in which the six were injured and the seventh killed while the ship's cargo was being discharged at Philadelphia, Pa. The vessel was owned and operated by A. Garcia y Cia., Ltda. (Garcia), the defendant. The longshoremen were employees of Jarka Corporation of Philadelphia (Jarka), a stevedoring company, which Garcia had engaged, as an independent contractor, to unload the cargo. Garcia brought in Jarka as a third-party defendant in each case, but that unresolved litigation is not now before this court.
 
 
 6
 With the district court's approval, all parties stipulated that the suit of Seawright, one of the longshoremen, would be tried, that the jury's findings in that case would be decisive of the question of liability in all, and that, if Garcia was determined to be liable in Seawright's action, the other suits would be separately tried on the damage issues only. In the Seawright case the jury answered special interrogatories submitted by the trial judge and rendered a general verdict for the plaintiff which was moulded to conform to the answers to the interrogatories. The amount of damages in each of the other cases was thereafter stipulated by the parties and judgments accordingly entered. Garcia's renewed post-trial motions to vacate the judgments, set aside the verdicts and to enter judgments in its favor were denied, except in one particular, by the district court, as were its motions for new trial. Six of these appeals by Garcia[1] present wholly common questions, while its seventh appeal[2] presents not only those questions but others which are akin to those in the single plaintiff's appeal[3] by the administratrix.
 
 
 7
 Appeals 11,995 to 12,000 and, in Part, 11,994.
 
 
 8
 Viewing the evidence in the light most favorable to plaintiffs, as we must after the verdict in Seawright's favor, the facts may be summarized as follows: the S.S. 'Atlantico' had been loaded by Cuban longshoremen at Sagua, Cuba, under the supervision of the ship's officers. The bags of sugar, weighing about 100 pounds each, were stowed on their flat sides, one atop the other, with the long dimension forward and aft. They were piled in thwartship tiers in the vessel's lower No. 2 hold, which was approximately 51 feet long and 39 feet wide. Each tier ran completely across the hold and was about 25 to 30 feet high. The method of stowage, if properly employed, was an acceptable method of stowing bagged cargo.
 
 
 9
 Two methods of discharge of the cargo were available. By one method, which was not used, a space could be created near the center of the hatch by the removal of several levels of bags. From this space longshoremen could work out to the perimeter of the hold and, by such removal, reduce the cargo to the level of the space initially created and then, by repetition of this operation, continue removal to the bottom of the hold. Because of the necessity of dragging the outer portions of the cargo across other of the cargo to the center of the hatch, this method had recognized inherent dangers both of injury to longshoremen and of damage to cargo. The other method, which was used, was to begin the removal of cargo at the middle of the forward half of the hold, instead of at the middle of the entire hold, and to discharge the cargo to the bottom of the forward half before discharge of the after half of the cargo was begun. This method had previously been employed to discharge the same type of cargo from the same hold of this ship on a number of occasions.
 
 
 10
 When No. 2 hatch was uncovered the longshoremen were ordered by their employer to unload the forward half of the hold first. The longshoremen were unable to note anything defective or significant about the stowage either when they began the discharge or during the unloading prior to the accident. Shortly before 6:00 P.M. nearly all cargo in the forward half of the hold had been discharged. charged. At that time the bags stowed in the after half of the hold, about 30 to 35 bags high, faced the eight men then in the hold. Without warning, a large number of bags from the front and top of this facing tier fell and engulfed the men, injuring six and killing the seventh.
 
 
 11
 The tier of bags behind the partially fallen tier was then visible. This second tier contained numerous bags which were on their sides or ends, or were canted or otherwise irregularly placed, in contrast with the even stow of the face tier. After the decedent and the injured had been removed the hatch was covered. It was discovered, on the morning following, that more bags in the tiers had fallen during the night. The cargo thus exposed, and that exposed during the subsequent unloading, disclosed bags on their sides, ends, and canted, as well as open spaces between bags.
 
 
 12
 The ship passed through severe weather, enroute from cuba, which caused her to pitch, toss and roll, but Jarka was not advised of this or of its probable effect on the stowage, nor was Jarka informed by the ship's officers about the manner or condition of original stowage.
 
 
 13
 The collapse of the face tier resulted from the manner of its stowage, the duty to supervise which, at the port of origin, was upon the ship's officers.
 
 
 14
 Plaintiffs' actions were based on Garcia's alleged negligence and the alleged unseaworthiness of the vessel. The jury found Garcia negligent and also found each plaintiff 2% contributorily negligent. Garcia asserts that it is entitled to judgment despite the Seawright verdict because of the jury's answer to the first interrogatory.[4] Garcia insists, first, that this answer must be interpreted to mean that the vessel was not unseaworthy and that the stowage of the cargo was neither unsafe nor improper. Such an interpretation would ascribe to the answer a more exact meaning than it warrants. The question, which the jury answered in the negative, did not, unfortunately, ask whether the stowage was safe and proper or whether the ship was seaworthy. As the question was phrased it is impossible, of course, to determine whether the jury found that the vessel was not unseaworthy or whether it found that it was unseaworthy but that the unseaworthiness was such as not to be a contributive factor to the accident.
 
 
 15
 The jury's affirmative answer to the second interrogatory established, consistently with the general verdict, that Garcia was negligent and that its negligence contributed to the accident. Garcia contends, secondly, that the answer to the first interrogatory firmly establishes either that the vessel was seaworthy or that, if it was unseaworthy, its unseaworthiness was not a contributing factor to the accident, and that there is no independent evidence, unrelated to the propriety and safety of the stowage, upon which a finding of negligence of Garcia could be predicated. With this interpretation and contention we do not, on this record, agree.
 
 
 16
 The trial judge instructed the jury that the plaintiff's claim was predicated 'on the negligence of the defendant and unseaworthiness of the ship.' He properly defined negligence and, in that connection, instructed the jury upon the defendant's duty 'to use reasonable care in furnishing the plaintiff a reasonably safe place in which to work.'
 
 
 17
 Upon the element of unseaworthiness, the trial judge instructed the jury that 'It is the non-delegable duty of the vessel and her owners to provide a seaworthy ship which includes proper and safe stowage. * * *,' and informed the jury of the consequence of failure to discharge that duty. He also instructed the jury to determine whether the injuries were the 'result of any unseaworthiness of the vessel, which, of course, * * * would include not only its equipment and appliances, but also unsafe and improper stowage.'
 
 
 18
 The trial judge did not, however, define 'unseaworthiness' or 'safe stowage,' nor did he more fully explain these terms in relation to plaintiff's claim. The parties acquiesced in and do not now complain of any omission. Garcia's acquiescence may have stemmed from knowledge that any further instruction requested would necessarily encompass an explanation that 'safe stowage' related not only to lack of danger to the vessel and the cargo itself, but also to those upon whom fell the task of unloading the cargo, and from knowledge that any further instruction requested would entail the explanation that 'unseaworthiness' included not only the vessel's unfitness for the voyage or for the receipt and carriage of its cargo, but its unfitness, as well, to discharge its cargo. Palazzolo v. Pan-Atlantic S.S. Corp., Pan-Atlantic S.S. Corp. v. Ryan Stevedoring Co., Inc., 2 Cir., 1954, 211 F.2d 277, affirmed Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 349 U.S. 901, 75 S.Ct. 575, 99 L.Ed. 1239; Gindville v. American-Hawaiian Steamship Company, 3 Cir., 1955, 224 F.2d 746.
 
 
 19
 Thus the jury, with the acquiescence of the litigants, was left to apply a common understanding of the terms 'safe stowage' and 'unseaworthiness.' 89 C.J.S., Trial, § 569a (1955 ed.). Viewed in this light, its answers to the first two interrogatories are not irreconcilable on this record. If the jury construed 'safe stowage' as relating to the safety of the ship and of the cargo itself, it could properly conclude that the manner of stowage endangered neither. If the jury applied to 'unseaworthiness' a common concept of unfitness for voyage or for receipt and carriage of cargo, it could properly conclude that the stowage did not render the ship unseaworthy in that sense.
 
 
 20
 It is difficult to perceive, however, under the evidence in this case, how the jury could fail to conclude that this cargo was stowed in a manner which did create a danger to those who attempted its removal by the same method as had been previously employed on this vessel at this port. Abundant evidence supports its affirmative answer to the second interrogatory and that answer is completely harmonious with the general verdict. Since the jury's answer to the first interrogatory is not unmistakably inharmonious with its answer to the second, or with the general verdict, the district court properly refused to vacate the verdict and enter judgment for the defendant. See Halprin v. Mora, 3 Cir., 1956, 231 F.2d 197.
 
 
 21
 The trial judge committed no substantial error, either in refusing defendant's request to amplify the charge in the one particular complained of, or in refusing to determine that the jury's finding of 2% contributory negligence on the part of each plaintiff was so contrary to the evidence as to necessitate a new trial.
 
 
 22
 Appeals 11,993 and 11,994.
 
 
 23
 The two claims embraced in the action of the administratrix of Thomas' estate are based on separate Pennsylvania statutes: one upon the wrongful death statute[5] and the other upon the survival statute.[6] The administratrix challenges the district court's denial of recovery on the former, while Garcia disputes that court's allowance of recovery on the latter. The question thus posed is whether the federal maritime law or the substantive law of Pennsylvania governs each of this plaintiff's two claims.
 
 
 24
 Under the general maritime law there is no right of recovery of damages for death resulting from a maritime tort. In Klingseisen v. Costanzo Transp. Co., 3 Cir., 1939, 101 F.2d 902, the appellant's claim was based on the same wrongful death statute upon which the present plaintiff relies for one of her claims. We there held that, while jurisdiction existed because of that statute, the right to maintain the suit could be enforced in admiralty only in accordance with the substantive law of Pennsylvania, which barred recovery on the ground of the decedent's contributory negligence. In The H. S. Inc., No. 72, 3 Cir., 1942, 130 F.2d 341, adhering to our decision in Klingseisen, we held that the rights of the parties were controlled by the substantive law of New Jersey.
 
 
 25
 Contributory negligence of the deceased is established in the present case. The administratrix urges, therefore, that both her claims should be resolved under the humane comparative negligence doctrine of maritime law, while Garcia contends that both claims should be governed by substantive state law, which bars recovery.
 
 
 26
 Had Thomas survived, his right of action arising from this alleged maritime tort would have been determined under maritime law. Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143. However, we do not construe certain of the language[7] in that case, as does O'Leary v. United States Lines Company, 1 Cir., 1954, 215 F.2d 708, to mean that the principles of general maritime law are to be applied when jurisdiction is invoked to enforce a right created by a state wrongful death statute.
 
 
 27
 Hawn had a right of action, independent of any Pennsylvania law, because his injury resulted from a maritime tort and was not fatal. Here, the injuries were fatal and neither the administratrix nor those for whose benefit her claim under the wrongful death statute is asserted had any right of action, under maritime law, to recover damages for the decedent's death, even though it resulted from a maritime tort. She did not seek to enforce any maritime right by a state created remedy.
 
 
 28
 No right of action existed in Pennsylvania, in or on behalf of the next of kin of a decedent whose death resulted from a tortious act, prior to the enactment of this wrongful death statute. That this statute created a new right of action, not for the injury to the deceased, but for the injury to those who suffered loss by reason of the death, is clear from the language of the Pennsylvania Supreme Court in Pezzulli v. D'Ambrosia, 1942, 344 Pa. 643, at page 647, 26 A.2d 659, at page 661:
 
 
 29
 This action '* * * represents a cause of action unknown to the common law and is for the benefit of certain enumerated relatives of the person killed by another's negligence; the damages recoverable are measured by the pecuniary loss occasioned to them through deprivation of the part of the earnings of the deceased which they would have received from him had he lived.'
 
 
 30
 It is significant that Justice Black, who delivered the opinions both in Pope & Talbot, Inc., v. Hawn, supra, and in Garrett v. Moore-McCormack Co., Inc., 1942, 317 U.S. 239, at page 245, 63 S.Ct. 246, at page 251, 87 L.Ed. 239, said, in the latter case:
 
 
 31
 'The constant objective of legislation and jurisprudence is to assure litigants full protection for all substantive rights intended to be afforded them by the jurisdiction in which the right itself originates. Not so long ago we sought to achieve this result with respect to enforcement in the federal courts of rights created or governed by state law. And admiralty courts, when invoked to protect rights rooted in state law, endeavor to determine the issues in accordance with the substantive law of the State.' (Emphasis supplied; footnotes omitted).
 
 
 32
 The test is whether the right is one rooted in the general maritime law or one rooted in the state law. When the origin of the right has been determined, the court, federal or state, must apply the law of that jurisdiction in which that right originated. This plaintiff, in seeking recovery under the wrongful death statute, undertakes the enforcement of a right which is neither rooted in nor recognized by the maritime or the common law, but is wholly state created. There was sufficient evidence to submit to the jury the issue of the decedent's contributory negligence and the district court correctly decided that the plaintiff's claim, which was based on the Pennsylvania wrongful death statute, was governed by the law of that state and was therefore barred by the decedent's contributory negligence.
 
 
 33
 The plaintiff's claim under the survival statute rests on a different foundation. In Pezzulli v. D'Ambrosia, supra, the Pennsylvania Supreme Court, referring to an action under the survival statute, said:
 
 
 34
 This '* * * is not a new cause of action at all, but merely continues in his personal representative the right of action which accrued to the deceased at common law because of the tort; the damages recoverable are measured by the pecuniary loss occasioned to him, and therefore to his estate, by the negligent act which caused his death.'In the present case, under maritime law, death abated the right of action which accrued to Thomas thereunder for the injury he suffered in this maritime accident. The effect of the state statute is merely to preserve Thomas' right of action and to continue it, unabated, in his administratrix. No new right is created. An existing right is preserved and a remedy afforded for its enforcement. Since the right preserved here is one rooted in maritime law, the district court properly applied the maritime rule of comparative negligence under which the decedent's contributory negligence was no bar to plaintiff's claim under the survival statute.
 
 
 35
 The judgments of the district court will be affirmed.
 
 
 
 [1]
 Nos. 11,995 to 12,000
 
 
 [2]
 No. 11,994
 
 
 [3]
 No 11,993
 
 
 [4]
 The first two interrogatories and the answers thereto were:
 
 
 [1]
 'Was there any unseaworthiness on the part of the SS 'Atlantico' which was a contributing factor in bringing about this accident?' Answer, 'No.'
 
 
 [2]
 'Was there any negligence on the part of the Defendant, A. Garcia y Cia. Ltda., which was a contributing factor in bringing about this accident?' Answer, 'Yes.'
 
 
 [5]
 Act of April 15, 1851, P.L. 669, § 19, 12 P.S. § 1601. Act of April 26, 1855, P.L. § 309, 1, Act of June 7, 1911, P.L. 678, § 1, Act of April 1, 1937, P.L. 196, § 1, 12 P.S. § 1602
 
 
 [6]
 Act of April 18, 1949, P.L. 512, art. VI, § 601,603, 20 P.S. § 320.601, 320.603
 
 
 [7]
 346 U.S. 406, at pages 409, 410, 74 S.Ct. at page 205: 'True, Hawn was hurt inside Pennsylvania and ordinarily his rights would be determined by Pennsylvania law. But he was injured on navigable waters while working on a ship to enable it to complete its loading for safer transportation of its cargo by water. Consequently, the basis of Hawn's action is a maritime tort, a type of action which the Constitution has placed under national power to control in 'its substantive as well as its procedural features * * *.' Panama R. Co. v. Johnson, 264 U.S. 375, 386, 44 S.Ct. 391, 393, 68 L.Ed. 748. And Hawn's complaint asserted no claim created by or arising out of Pennsylvania law. His right of recovery for unseaworthiness and negligence is rooted in federal maritime law. Even if Hawn were seeking to enforce a state-created remedy for this right, federal maritime law would be controlling. While states may sometimes supplement federal maritime policies, a state may not deprive a person of any substantial admiralty rights as defined in controlling acts of Congress or by interpretative decisions of this Court.'