252 F.2d 14
 Olga SKOVGAARD, Administratrix ad Prosequendam of the Estate
of Carl E. Skovgaard, Deceased, and Olga
Skovgaard, Administratrix of the Estate
of Carl E. Skovgaard,
Deceased, Libellant-Appellant,
v.
THE Vessel M/V TUNGUS, Her Boilers, etc., and Den Norske
Afrika-Og Australielinie, Wilhelmsens Dampskibsaktieselskab,
et al., Respondents-Appellants (El Dorado Oil Works,
Respondent-Impleaded-Appellee).
 Nos. 12,025, 12,031.
 United States Court of Appeals Third Circuit.
 Reargued Oct. 22, 1957.
Decided Dec. 23, 1957.
 
 Nathan Baker, Bernard Chazen, Hoboken, N.J. (Baker, Garber & Chazen, Milton Garber, Hoboken, N.J., on the brief), for Olga Skovgaard.
 J. Ward O'Neill, New York City (McAleer, Connell & Corridan, Jersey City, N.J., Haight, Gardner, Poor & Havens, New York City, David P. H. Watson, New York City, on the brief), for The Tungus, and others.
 Joseph M. Cunningham, New York City (Wilbur A. Stevens, Newark, N.J., Kirlin, Campbell & Keating, New York City, on the brief), for El Dorado Oil Works.
 Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.
 STALEY, Circuit Judge.
 
 
 1
 This admiralty appeal urges upon us the contention that the New Jersey Wrongful Death Act, N.J.S.A. 2A:31-1, is broad enough to encompass an action for death based upon a breach of the warranty of seaworthiness.
 
 
 2
 Carl E. Skovgaard met his death by suffocation and shock when he slipped and fell into a tank of heated coconut oil aborad the M/V Tungus. On December 5, 1952, the Tungus, with a cargo of coconut oil, was docked at a pier in navigable waters at Bayonne, New Jersey. The respondent-impleaded El Dorado Oil Works agreed with the owners of the oil cargo in the port deep tank to discharge the oil from the vessel and to store it. Employees of El Dorado began to discharge the oil from the tank around 8:00 p.m. of December 5, 1952. Two officers and two crew members of the Tungus remained aboard on duty; the latter two were specifically assigned to assist El Dorado in the discharge operations. The pump owned by El Dorado and used in the operation was apparently in good working order until around 12:15 a.m., December 6. It was then that an air injection nipple burst, causing tons of hot coconut oil to be pumped directly onto the shelter deck of the Tungus. It was the crew of the vessel that first discovered the leak and took temporary steps to stop it.
 
 
 3
 The deceased Skovgaard was a maintenance foreman of El Dorado. He was called from his home shortly after the leak developed to assist in repairing the pump. He arrived on board around 1:25 a.m. As Skovgaard walked aft of the port tank, he stepped on the hatch beams and then attempted to step onto the top of the tank. He slipped on the spill and fell to his death in the hot oil.
 
 
 4
 The suit was brought by Olga Skovgaard, administratrix of the estate of the deceased. Her libel pleads principally two causes of action, one predicated on unseaworthiness, the other on negligence. Both of these causes of action were based upon the New Jersey Wrongful Death Act, N.J.S.A. 2A:31-1. After trial was held, the district court dismissed the libel, deciding that an action for death by unseaworthiness did not lie in the general maritime law, and as to the negligence question, that the vessel owed no duty to the deceased to clean up the oil spill. D.C.N.J.1956, 141 F.Supp. 653. The impleading petition against El Dorado was dismissed; respondent took a precautionary appeal from this action.
 
 
 5
 It is an established principle of maritime law that in the absence of statute there is no remedy for wrongful death. The Harrisburg, 1886, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358; Levinson v. Deupree, 1953,345 U.S. 648, 650, 73 S.Ct. 914, 97 L.Ed. 1319. 'Death is a composer of strife by the general law of the sea as it was for many centuries by the common law of the land.' Justice Cardozo in Cortes v. Baltimore Insular Line, Inc., 1932, 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368. In an effort to obviate a plain inequity, Congress in 1920 enacted the Death on the High Seas Act, 46 U.S.C.A. 761 et seq., which provided a remedy in admiralty for death occurring more than a marine league from shore. This statute, of course, does not apply to death occurring on territorial waters. Nonetheless, when death occurs on navigable waters within a state whose statutes have created a cause of action for death by wrongful act, admiralty courts will entertain such an action by permitting the state statute to supplement the general maritime law. Western Fuel Co. v. Garcia, 1921, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210; Just v. Chambers, 1941, 312 U.S. 383, 388, 668, 61 S.Ct. 687, 85 L.Ed. 903.
 
 
 6
 It follows that whatever right appellant has in seeking redress for the death of Skovgaard must be based upon the New Jersey Wrongful Death Act, N.J.S.A. 2A:31-1, which reads as follows:
 
 
 7
 'When the death of a person is caused by a wrongful act, neglect or default, such as would, if death had not ensued, have entitled the person injured to maintain an action for damages resulting from the injury, the person who would have been liable in damages for the injury if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured and although the death was caused under circumstances amounting in law to a crime.'
 
 
 8
 Appellant urges that unseaworthiness is a 'wrongful act, neglect or default' within the meaning of the New Jersey Act.
 
 
 9
 We are of the opinion that the district court misconceived the nature of the first cause of action as a death action under general maritime law. It was in fact brought specifically under the New Jersey death act.
 
 
 10
 In the determination of whether unseaworthiness is such a 'wrongful act, neglect or default' as will admit of recovery, we must look to the construction given to the Act by the New Jersey courts. They have held that the Act is in the highest sense remedial, and is entitled to a liberal construction, for its aim was to abolish a harsh and technical rule of the common law. Haggerty v. Central Railroad Co., 1865, 31 N.J.L. 349; Cibulla v. Pennsylvania-Reading Seashore Lines, 1946, 25 N.J.Misc. 98, 50 A.2d 461.
 
 
 11
 The nature of the conduct which will create liability under the New Jersey statute is of crucial importance. The legislature describes it as 'wrongful act, neglect or default.' It is presumed that the legislature did not employ useless verbiage and that each word has independent meaning. Ford Motor Co. v. New Jersey Department of Labor and Industry, 1950, 5 N.J. 494, 76 A.2d 256, 260; 82 C.J.S. Statutes 316 at pages 551-552 (1953). The conduct required to impose liability, therefore, is not limited to that conduct embraced in the historical concept of negligence. The words encompass something more. See, e.g., The H.S., Inc., No. 72, 3 Cir., 1942, 130 F.2d 341; Judson v. Peoples Bank & Trust Co. of Westfield, 1954, 17 N.J. 67, 110 A.2d 24, 35-36.
 
 
 12
 It is urged that since unseaworthiness is spoken of as a species of liability without fault, it cannot be a 'wrongful act, neglect or default' within the meaning of the statute. However, the characterization of unseaworthiness as liability without fault is dangerously deceptive. For urgent and sound reasons of public policy, the law has imposed the absolute duty upon the shipowner to provide a seaworthy vessel, and liability results only as a consequence of the breach of that duty. If 'fault' means negligence alone, of course no fault is required, and to that extent only, the phrase 'liability without fault' is accurate. But to say that one who breaches a duty is without fault is a logical as a legal incongruity.
 
 
 13
 The seaman possesses the legal right of a seaworthy ship. Whenever this legal right is infringed and harm results by reason of the ship being unseaworthy, a 'wrong' occurs, whether it be of omission or commission. The Supreme Court of New Jersey has defined 'wrongful act' as 'any act which in the ordinary course will infringe upon the rights of another to his damage, except it be done in the exercise of an equal or superior right.' Louis Schlesinger Co. v. Rice, 1950, 4 N.J. 169, 72 A.2d 197, 203. Culpability is not necessary to constitute a wrong. It is the liability-creating quality of an act which makes it wrongful.
 
 
 14
 If it be said that the New Jersey act provides redress for tortious conduct alone, we answer that providing an unseaworthy ship is a tort. As was said in Strika v. Netherlands Ministry of Traffic, 2 Cir., 1950, 185 F.2d 555, 558:
 
 
 15
 'It would follow from that analysis that the breach of the 'obligation' to furnish a seaworthy ship is a tort; and that is a result consonant with the historical attitude towards breaches of warranty, which until 1778 had to be sued in tort, and which may still be so treated if the distinction is important.' The New York Court of Appeals has decided in a food poisoning case that the breach of the warranty of fitness for human consumption, imposed by law upon considerations similar to the imposition of the warranty of unseaworthiness, is a 'wrongful act, neglect, or default' within the New York wrongful death statute. Greco v. S.S. Kresge Co., 1938, 277 N.Y. 26, 12 N.E.2d 557, 560, 115 A.L.R. 1020.
 
 
 16
 The New Jersey statute further refers to the 'wrongful act, neglect, or default' as one 'such as would, if death had not ensued, have entitled the person injured to maintain an action for damages resulting from the injury.' This language may admit of alternative interpretation. It may be construed as defining the nature of the 'wrongful act, neglect or default'-- i.e., if the conduct would have been actionable by the decedent had he lived, by virtue of that very fact his named beneficiaries would have an action in the event of his death. Or the clause may be construed as a limitation or an additional requirement-- i.e., the conduct upon which the suit is based must be such that decedent could have sued had he lived, in addition to being a 'wrongful act, neglect or default.' In either interpretation, the statutory requirements are met by plaintiff here, for if Skovgaard had merely been injured he could have maintained an action against the vessel on the theory of unseaworthiness, since he was one 'within the range of its humanitarian policy.' Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 95, 66 S.Ct. 872, 877, 90 L.Ed. 1099.
 
 
 17
 We hold that the failure to provide a seaworthy vessel in the case before us is such 'wrongful act, neglect or default' as will allow recovery under the New Jersey wrongful death statute.[1]
 
 
 18
 The same conclusion was reached by Judge Learned Hand in his dissenting opinion[2] in Gill v. United States, 2 Cir., 1950, 184 F.2d 49, 57:
 
 
 19
 '* * * Is a vessel owner liable for a seaman's-- or a longshoreman's-- death within the territorial waters of a state, when it is caused by the unseaworthiness of the vessel? I have no doubt that the death was owing to the respondent's 'wrongful act, neglect or default,' as the New Jersey Act uses those words * * *.'
 
 
 20
 The right thus created by the New Jersey statute may be enforced in a court of admiralty, for it is certainly 'not hostile to the characteristic features of the maritime law or inconsistent with federal legislation.' Just v. Chambers, 312 U.S. at page 388, 61 S.Ct. at page 691, 85 L.Ed. 903.
 
 
 21
 In Lee v. Pure Oil Co., 6 Cir., 1955, 218 F.2d 711, it was held that an action for unseaworthiness would not lie pursuant to the Tennessee wrongful death act. It must be noted, however, that the Sixth Circuit commented that the Tennessee Act allowed recovery only for negligence.
 
 
 22
 To the extent that Graham v. A. Lusi, Limited, 5 Cir., 1953, 206 F.2d 223, and Mortenson v. Pacific Far East Line, Inc., D.C.N.D.Cal.1956, 148 F.Supp. 71 express views on similar statutes of other states contrary to those expressed in this opinion, we are in disagreement with them.
 
 
 23
 As to the negligence question, the holding of the district court that no duty devolved upon the vessel Tungus to clean up the oil spill was predicated upon a finding of fact that the operation of repairing the pump was conducted by El Dorado, and that no evidence indicated that Tungus personnel either supervised or controlled the discharge of the oil.
 
 
 24
 While it may be true that El Dorado supervised the pump repair operation, this would hardly lessen the duty of the vessel to provide a reasonably safe place to work, especially since El Dorado's supervision was not so complete as to exclude crew members from the area. In fact, it was the crew which first discovered the oil leakage and adopted temporary measures to stop it. The Chief officer of the Tungus testified that it was the custom to offer the assistance of ship personnel to independent contractors unloading the vessel. The personnel of the Tungus were well aware of the existence of the oil spill and the danger created by it.
 
 
 25
 The assimilation by Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, of longshoremen to the position of seamen so far as unseaworthiness is concerned did not take away from the longshoreman his accustomed right to recovery on the theory of negligence. Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 413-414, 74 S.Ct. 202, 98 L.Ed. 143. Engaged in the work of unloading the ship, Skovgaard was a business invitee. See concurring opinion of Justice Frankfurter in Pope & Talbot, Inc. v. Hawn, supra, 346 U.S. at page 416, 74 S.Ct. at page 208; see also Santamaria v. Lamport & Holt Line, Err. & App.1938, 119 N.J.L. 467, 196 A. 706. It is relevant to note at this point that Skovgaard was called for the purpose of repairing the pump, not to clean up the oil spill. It is alleged that his death was caused by the condition of the deck and tank and not by the instrumentality he intended to repair. Cf. Broecker v. Armstrong Cork Co., Err. & App.1942, 128 N.J.L. 3, 24 A.2d 194.
 
 
 26
 The duty of providing Skovgaard with a reasonably safe place to work, Hawn v. Pope & Talbot, Inc., 3 Cir., 1952, 198 F.2d 800, 803, affirmed 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, would not be lessened even if there were a concurrent duty on the part of Skovgaard's employer. Feinman v. A. H. Bull Steamship Co., 3 Cir., 1954, 216 F.2d 393.
 
 
 27
 While the New Jersey wrongful death statute adopts the maritime standard of care, it is silent as to available defenses. It is not for us in the first instance, however, but rather for the trier of fact, to determine whether the vessel's duty was breached and to decide factually what defenses, if any, might be available to the respondent. The question of the unseaworthiness of the vessel is likewise one which should be determined initially by the district court.
 
 
 28
 The judgment of the district court dismissing the libel will be reversed, and the cause will be remanded for further proceedings in conformity with this opinion. The judgment of the district court also dismissed the impleading petition as a consequence of the dismissal of the libel. This will also be reversed inasmuch as the liability of the impleaded defendant cannot be determined until there has been a full and adequate development of the facts.
 
 
 29
 HASTIE, Circuit Judge, with whom MARIS and KALODNER, Circuit Judges join (dissenting).
 
 
 30
 In one aspect the present libel pictures the shipboard death of libellant's decedent within the state of New Jersey as having resulted, without negligence on the part of the respondent shipowner, from an unseaworthy condition of the vessel. This court now holds that New Jersey, in its Wrongful Death Act, has made a non negligent shipowner liable for death thus caused within the borders of that state. We think this is a mistaken interpretation of the New Jersey law and, therefore, dissent.
 
 
 31
 The division of the court on this point seems best explained by starting with certain premises and underlying concepts upon which all of us agree. A federal court is here asked to enforce a cause of action, the existence and dimensions of which are determined solely by the law and policy of New Jersey. True, the United States District Court which heard this case was sitting 'in admiralty'. But for present purposes this is significant only in that the practice properly followed in that forum is admiralty practice. Thus, the proper form of complaint in this case was a libel in the admiralty style. The shipowners could be reached by attaching the vessel in the classic admiralty manner. But beyond such matters of legal administration, the substantive concepts of admiralty had no effect as law in defining the claim. State law and it alone performed that function. Admiralty was merely the administering forum in a situation in which the maritime law itself did not even provide a cause of action for wrongful death.
 
 
 32
 The Supreme Court has recently made an explicit and authoritative statement of what a district court does in a situation like this:
 
 
 33
 'The United States District Court for the Eastern District of Kentucky heard this suit sitting in admiralty. * * * The District Court adopted and enforced the obligatio created by the State of Kentucky not because it sits in Kentucky and responds to the desirability of uniformity in the administration of justice within that State. In the absence of congressional action, the court adopted and enforced the obligatio created by Kentucky as it would one originating in any foreign jurisdiction. * * * And it was bound to enforce it as it found it, * * * (except for) procedural niceties. * * *'[1]
 
 
 34
 For present purposes the most important part of this exposition is the concluding sentence: 'it (the federal admiralty court) was bound to enforce it (the state obligatio) as it found it. * * *'
 
 
 35
 Thus, to the extent that state policy has led the state legislature to give dependents rights against one who has caused the death of their provider within the state, a federal court will carry out that policy. Ordinarily the federal court entertains the state created wrongful death claim on its law side. But where the fatal injury has occurred on navigable water, it is accepted practice to entertain the suit on the admiralty side. But, in either event, it is the state law, as defined and construed in the light of state policy, which the federal court must apply.
 
 
 36
 It is believed that all members of this court accept the above outlined legal theory of what a federal court does and how it should approach its task in a case like this. However, we who dissent think the majority has disposed of this case as if admiralty policies and concepts developed by federal courts in maritime causes were controlling when there is nothing to show that New Jersey has adopted or would adopt these federal maritime concepts of liability to define rights it has created as part of its common law jurisprudence.
 
 
 37
 The New Jersey Wrongful Death Act, like most prototypes of Lord Campbell's Act, gives dependents a right to recover for death caused by the 'wrongful act, neglect or default' of another. Historically, neither the common law nor any statute of New Jersey seems ever to have utilized the circumstance of unseaworthiness as a basis of imposed liability for non-negligent personal injury. To reach this court's result it is necessary to attribute to New Jersey a purpose to make a novel piecemeal borrowing of maritime concepts.
 
 
 38
 We call this borrowing novel and piecemeal advisely. It has long been a peculiar and characteristic feature of admiralty law that a ship is responsible to indemnify members of its company for injuries caused by the unseaworthiness of the vessel.[2] But historically this responsibility covered only the members of the crew.[3] Moreover, a crewman's rights did not survive him. It is only in recent years, long since the enactment of the New Jersey Wrongful Death Act, that admiralty case law of the United States courts has extended the seaman's protection against unseaworthiness to longshoremen and other persons not members of the crew.[4] Thus, to construe the New Jersey statute as applicable to the present case, requires not only the inference that the New Jersey statute was intended to create rights in accordance with admiralty concepts of liability as they existed when the legislation was passed, but also that subsequent modifications of admiralty concepts by the federal courts routinely become a part of New Jersey policy and law.
 
 
 39
 Moreover, although the majority do not face the problem here, the question must arise whether under the prevailing analysis New Jersey accepts the unseaworthiness concept alone in defining the statutory rights it has created, or whether other admiralty doctrines, notably that of comparative negligence, are also part of the state created right. This court and others have from time to time rejected the idea that state wrongful death causes incorporate the admiralty comparative negligence concept.[5] If the fact that comparative negligence is a liability defining concept peculiar to maritime alw prevents its implied incorporation in a state created death cause, the same seems equally true of the maritime unseaworthiness concept.
 
 
 40
 Thus, even if the New Jersey cases provided no guide for the interpretation of the Wrongful Death Act in situations of this kind the conclusion reached by the majority would seem illogical and for that reason unwarranted. We are the more confident of this view since several federal and state courts interpreting death statutes of other states have been unable to find any satisfactory rationale for the use of the unseaworthiness concept in defining the causes of action which these state statutes have created.[6]
 
 
 41
 But we think the New Jersey cases are instructive and helpful. They show rather clearly the way in which the New Jersey courts understand their Wrongful Death Act. As a general proposition, common law concepts of tort, with negligence a prerequisite to recovery, are read into the New Jersey statute by the courts of that state. If a fatal accident occurs on land or non-navigable water within New Jersey, or if anyone other than the shipowner is sued for a fatal accident on a ship in navigable New Jersey water, there is no question that New Jersey policy and law require a showing of lack of due care to establish a claim under the Wrongful Death Act.[7] It would be strange for New Jersey to rule that under the general wording of the statute, there is a different and more stringent duty on shipowners in navigable water. At least two cases indicate the absence of any such special onerous responsibility on shipowners.
 
 
 42
 In Santamaria v. Lamport & Holt Line, Ltd., E. & A. 1938, 119 N.J.L. 467, 196 A. 706, an action under the New Jersey Wrongful Death Act, a shipowner was sued for the death of a stevedore who, while unloading a vessel, was thrown into the hold by the unpending of a board constituting part of a hatch cover. In Moran v. Moore-McCormack Lines, 1944, 131 N.J.L. 332, 36 A.2d 415, a personal injury case, one line of proof indicated that a stevedore's injury had been caused by a latent defect in a skid which the shipowner had provided for the unloading and transferring of cargo. In both cases the New Jersey courts emphasized the absence of liability unless negligence on the part of the shipowner should be proved. True, there was no discussion of the unseaworthiness of vessel or gear as a possible basis of liability without fault. Still if the substantive law of New Jersey as applicable to wrongful death causes recognizes an absolute duty of a shipowner to supply a longshoreman with a seaworthy vessel and gear, it is very difficult to believe that neither court nor counsel would advert to this legal basis of liability in cases so obviously appropriate for its invocation. It should be added that we have found no mention of this possibility in any other New Jersey case.
 
 
 43
 We think it clear that in administering their Wrongful Death Act, whether the injury has been on land or water and whether the defendant has been a shipowner or anyone else, the New Jersey courts have consistently defined and confined liability within common law concepts of negligent or intentional wrong. For a federal court to say now that the law of New Jersey is otherwise is to rule in derogation of the whole history of New Jersey litigation interpreting a New Jersey statute as based on Common law concepts.
 
 
 44
 Finding no New Jersey cases helpful, the majority point to decisions of several other state courts holding that death caused by breach of warranty of quality of goods may be actionable under their death statutes.[8] But these cases illustrate the very point we are stressing in dissent. In these states there are statutes or decisions, or both, clearly showing the state policy and legal rule making such adulteration of foods an actionable wrong. It then is logical to view death caused by such violation of state policy and requirements as actionable under the local Wrongful Death Act. It is the absence of any such New Jersey concept of unseaworthiness as an actionable wrong which requires an opposite result in this case.
 
 
 45
 Finally, the majority find support for their view in the fact that the New Jersey statute in terms comprehends fatal injury 'such as would, if death had not ensued, have entitled the person injured to maintain an action for damages resulting from the injury'. This provision is present in almost all death statutes of this type and has been universally considered to be a limiting concept. See Prosser, Torts, 105 (2d ed. 1955). The liability defining part of the statute is found in the words 'wrongful act, neglect or default'. The limiting words which follow serve only to make sure that defenses which would have been available against the decedent, had he lived, shall be available against the wrongful death claim. We think these limiting words have no bearing upon our present problem whether a maritime type of liability without fault is created by the preceding phrase, 'wrongful act, neglect or default'.
 
 
 46
 For the foregoing reasons we think the New Jersey law provides no cause of action for death resulting from unseaworthiness without negligence. Judge Maris and Judge Kalodner would go farther and say that the result of the majority would be incorrect even if New Jersey did incorporate the unseaworthiness concept of admiralty. In this case the district court found as a fact that the decedent knew of the presence of the oil slick which caused him to slip and fall to his death. Indeed, the record shows beyond question that this condition was apparent and obvious. In addition, decedent boarded the ship to repair the very defective valve which had caused the oil to leak and spread over the deck. In these circumstances Judge Maris and Judge Kalodner would hold, relying upon Bruszewski v. Isthmian SS. Co., 3 Cir., 1947, 163 F.2d 720 certiorari denied 333 U.S. 828, 68 S.Ct. 451, 92 L.Ed. 1113, that, even applying concepts of the maritime law, a shipowner does not warrant, to one so situated and informed as this workman, that the deck is free of oil or of the obvious hazards incidental to the presence of that substance. However, I am content to rest my dissent solely upon on the construction and application of the New Jersey law, without examining the reach of the unseaworthiness doctrine, if maritime law were applicable.
 
 
 47
 This case has a second aspect. The libellant undertook to prove that, quite apart from unseaworthiness, the shipowner was responsible for actionable negligence on the part of the ship's personnel in not providing the decedent with a reasonably safe place to work. On the evidence and the findings we think the defendant was entitled to judgment on this branch of the case.
 
 
 48
 Here again the majority seem to apply federal admiralty concepts to define a state created death claim. But the question to be decided is the extent of the duty which New Jersey law imposes upon the possessor of a place to provide a safe place to work for employees of independent contractors who entered the place as business invitees. The fact that the place in this case is a ship is incidental and irrelevant for present purposes.
 
 
 49
 We have already pointed out that in this case it has been established as a fact that the dangerous condition was obvious and actually known to the decedent. In Newbury v. American Stores Co., 1935, 115 N.J.L. 604, 607, 180 A. 875, 876, the Court of Errors and Appeals stated the rule of New Jersey law which is controlling in such circumstances: 'It is axiomatic that the rule, that one who enters store premises by invitation may lawfully assume that the proprietor has performed his duty to render the premises reasonably safe, is not applicable where the invitee knows the contrary to be the case.' We think Broecker v. Armstrong Cork Co., E. & A.1942, 128 N.J.L. 3, 24 A.2d 194, turns on the same principle that a danger which is obvious to the business visitor does not constitute a breach of duty to provide him with a safe place to work. Indeed, this appears to be a principle which is generally accepted in the law of torts.[9]
 
 
 50
 In these circumstances it is immaterial whether admiralty law, in cases to which it is applicable, may impose a more stringent duty. New Jersey tort principles are controlling here, and under them, on the admitted facts, the person in possession of the place of injury was not responsible for death caused by a condition of which the invitee was fully cognizant.
 
 
 51
 In our view the judgment below should be affirmed.
 
 
 
 [1]
 It is interesting to note that this court has several times held in the determination of the question of laches in an action for personal injuries based upon unseaworthiness that the analogous statute of limitations to be applied is the Pennsylvania two-year statute which uses language substantially similar to the New Jersey Wrongful Death Act. The time limitation is imposed in actions for injury 'wrongfully done to the person.' Act of June 24, 1895, P.L. 236, 2, 12 Purdon's Pa.Stat.Ann. 34. See Kane v. Union of Soviet Socialist Republics, 3 Cir., 1951, 189 F.2d 303, certiorari denied 1952, 342 U.S. 903, 72 S.Ct. 292, 96 L.Ed. 676; and Taylor v. Crain, 3 Cir., 1952, 195 F.2d 163
 
 
 [2]
 The disposition by the majority rendered a decision on this issue unnecessary
 
 
 [1]
 Levison v. Deupree, 1952, 345 U.S. 648, 651-652, 73 S.Ct. 914, 916, 97 L.Ed. 1319. And see the similar rationalization of Circuit Judge, now Chief Judge, Biggs in Klingseisen v. Costanzo Transp. Co., 3 Cir., 1939, 101 F.2d 902, 903
 
 
 [2]
 The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760
 
 
 [3]
 See Tetreault, Seamen, Seaworthiness and the Rights of Harbor Workers, 1954, 39 Corn.L.Q. 381, 408
 
 
 [4]
 Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (longshoreman); Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (carpenter working on a ship)
 
 
 [5]
 Curtis v. A. Garcia Y Cia., Ltda., 3 Cir., 1957, 241 F.2d 30; Klingseisen v. Costanzo Transp. Co., 3 Cir., 1939, 101 F.2d 902; Byrd v. Napoleon Ave. Ferry Co., D.C.E.D.La.1954, 125 F.Supp. 573, affirmed per curiam 5 Cir., 1955, 227 F.2d 958, certiorari denied 351 U.S. 925, 76 S.Ct. 783, 100 L.Ed. 1455; Feige v. Hurley, 6 Cir., 1937, 89 F.2d 575
 
 
 [6]
 Lee v. Pure Oil Co., 6 Cir., 1955, 218 F.2d 711; Graham v. A. Lusi, Ltd., 5 Cir., 1953, 206 F.2d 223; Mortenson v. Pacific Far East Line, Inc., D.C.N.D.Cal., 1956, 148 F.Supp. 71; Babin v. Lykes Bros. S.S. Co., La.App.1957, 94 So.2d 715
 
 
 [7]
 E.g., Stewart v. Norton, 1951, 6 N.J. 591, 80 A.2d 111; DeCicco v. Marlou Holding Co., E. & A.1948, 137 N.J.L. 186, 59 A.2d 227
 
 
 [8]
 Greco v. S. S. Kresge Co., 1938, 277 N.Y. 26, 12 N.E.2d 557, and cases collected in 115 A.L.R. 1020
 
 
 [9]
 Torts, Restatement, 340, 343; Ambrose v. Moffat Coal Co., 1948, 358 Pa. 465, 58 A.2d 20. McCreery v. Westmoreland Farm Bureau Co-operative Ass'n, 1947, 357 Pa. 567, 55 A.2d 399